## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x

In re                       :        **Chapter 11**

                            :

**PROSPECTOR OFFSHORE**   :      **Case No. 17-_____ (___)**

**DRILLING S.à r.l.,** *et al,*    :

                           :        **Joint Administration Requested**

          **Debtors.**[1]        :

-------------------------------------------------------x

### DECLARATION OF LEE M. AHLSTROM IN SUPPORT OF
### THE NEW DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Lee M. Ahlstrom, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Senior Vice President and Interim Chief Financial Officer of Paragon Offshore Limited ("**New Paragon**"). I am also a manager of Prospector Offshore Drilling S.à r.l. ("**Prospector Parent**"), a subsidiary of Paragon Offshore plc (in administration) ("**Paragon Parent**").

2.      I have served as the Senior Vice President of Investor Relations, Strategy, and Planning for Paragon Parent. Prior to working for Paragon Parent, I acted as Senior Vice President of Strategic Development for Noble Corporation plc ("**Noble**") from May 2011 to July 2014 and as Vice President of Investor Relations & Planning for Noble from May 2006 to April 2011. Prior to joining Noble, I held various positions at other companies within the oil and gas

---

[1] The New Debtors in these chapter 11 cases, along with the last four digits of each New Debtor's federal tax identification number, as applicable, are: Prospector Offshore Drilling S.à r.l. (4427); Prospector Rig 1 Contracting Company S.à r.l. (7441); Prospector Rig 5 Contracting Company S.à r.l. (0985); and Paragon Offshore plc (in administration) (6017). The mailing address for Prospector Offshore Drilling S.à r.l., Prospector Rig 1 Contracting Company S.à r.l., and Prospector Rig 5 Contracting Company S.à r.l. is 3151 Briarpark Drive, Suite 700, Houston, Texas 77042. The mailing address for Paragon Offshore plc (in administration) is c/p Deloitte LLP, Four Brindleyplace, Birmingham, B1 2HZ, United Kingdom. Neville Barry Kahn and David Philip Soden, each of Deloitte LLP, are the joint administrators of Paragon Offshore plc (in administration) (the "**Joint Administrators**"). The affairs, business and property of Paragon Offshore plc (in administration) are managed by the Joint Administrators.

industry such as Exxon Company USA, Burlington Resources, and Unocal Corporation.  I earned both a Bachelor of Science degree and Master of Science Degree in Mechanical Engineering from the University of Delaware.

3.       I submit this declaration (the "**Declaration**") in support of the voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed by Prospector Offshore Drilling S.à r.l., Prospector Rig 1 Contracting Company S.à r.l., Prospector Rig 5 Contracting Company S.à r.l., and Paragon Parent (collectively, the "**New Debtors**") and the "first day" motions (the "**First Day Motions**") filed with this Court on the date hereof (the "**Petition Date**").

4.       Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the New Debtors' management team and the New Debtors' advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the New Debtors' operations and financial condition.  If called to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the New Debtors.

## Background on the New Debtors

5.       Prospector Parent is an offshore drilling company organized in Luxembourg.  A corporate organization chart of Prospector Parent, along with certain of its New Debtor and non-debtor subsidiaries (collectively, the "**Prospector Entities**" or "**Prospector**"), is annexed hereto as **Exhibit A**.

6.       Paragon Parent completed an acquisition of all the issued and outstanding shares in Prospector Parent (the "**Prospector Acquisition**") in February 2015.  The Prospector Acquisition expanded Paragon Parent's drilling fleet by adding two additional high specification

2

jackup rigs in the U.K. North Sea, Prospector 1 (the "**Prospector 1 Rig**") and Prospector 5 (the

"**Prospector 5 Rig**," and together with the Prospector 1 Rig, the "**Rigs**").  Paragon Parent also

acquired three Prospector non-Debtor subsidiaries that have contracted for the construction of

three newbuild high specification jackup rigs.

### The Sale-Leaseback Transaction

       7.      At the time of the Prospector Acquisition, two of Prospector Parent's non-

Debtor subsidiaries, Prospector Rig 1 Owning Company S.à r.l. and Prospector Rig 5 Owning

Company S.à r.l. (the "**Prospector Rig Owning Companies**"), owned the Rigs.  On June 3,

2015, as part of a sale-leaseback transaction (the "**Sale-Leaseback Transaction**"), the

Prospector Rig Owning Companies entered into:

- the Memorandum of Agreement in Respect of Self-Elevating Drilling Unit "Prospector 1," dated June 3, 2015, between Prospector One Corporation (the "**Prospector 1 Lessor**") and Prospector Rig 1 Owning Company S.à r.l.; and

- the Memorandum of Agreement in Respect of Self-Elevating Drilling Unit "Prospector 5," dated June 3, 2015, between Prospector Five Corporation (the "**Prospector 5 Lessor**" and, together with the Prospector 1 Lessor, collectively, the "**Third Party Lessors**") and Prospector Rig 5 Owning Company S.à r.l.

       8.      Pursuant to these agreements, the Prospector Rig Owning Companies

agreed to sell the Rigs to the Third Party Lessors, which are subsidiaries of SinoEnergy Capital

Management, Ltd. ("**SinoEnergy**"), for an aggregate sale price of approximately $300 million

($292 million net proceeds).  The sales of the Rigs closed on July 24, 2015.

       9.      In connection with these sales, the Third Party Lessors entered into

agreements to lease the Rigs to New Debtor Prospector Rig 1 Contracting Company S.à r.l. and

New Debtor Prospector Rig 5 Contracting Company S.à r.l. (collectively, the "**Lessee Debtors**").

RLF1 17854168V.1

Specifically, the Third Party Lessors and the Lessee Debtors entered into the following lease agreements, each for a lease period of five years (the "**Lease Term**"):

- Lease Agreement, dated as of June 3, 2015, by and between Prospector One Corporation and New Debtor Prospector Rig 1 Contracting Company S.à r.l. (the "**Prospector 1 Lease Agreement**"); and

- Lease Agreement, dated as of June 3, 2015, by and between Prospector Five Corporation and New Debtor Prospector Rig 5 Contracting Company S.à r.l. (the "**Prospector 5 Lease Agreement**" and, together with the Prospector 1 Lease Agreement, collectively, the "**Sale-Leaseback Agreements**").

10.     To secure obligations arising under the Sale-Leaseback Agreements, the Lessee Debtors granted security interests (the "**Prepetition Liens**") in their rights, title, and interest in the monies credited, paid, or caused to be credited to certain "Pledged Accounts" (as defined in the Pledge Agreements described below) and all proceeds to Industrial and Commercial Bank of China, New York Branch ("**ICBC**"), as security agent (the "**Security Agent**"). As additional security, Paragon Parent pledged its shares in Prospector Parent in favor of the Security Agent and Prospector Parent issued guarantees and pledged its shares in the Lessee Debtors to the Security Agent. A list of these "Security Documents" (as defined in the Sale-Leaseback Agreements) include, among others:

- that certain Account Control and Pledge Agreement, dated as of July 24, 2015, by and between Prospector Rig 1 Contracting Company S.à r.l., Prospector One Corporation, and ICBC, governed by New York law (the "**Prospector 1 Pledge Agreement**");

- that certain Account Control and Pledge Agreement, dated as of July 24, 2015, by and between Prospector Rig 5 Contracting Company S.à r.l., Prospector Five Corporation, and ICBC, governed by New York law (the "**Prospector 5 Pledge Agreement**," and together with the Prospector 1 Pledge Agreement, the "**Pledge Agreements**");

- that certain Guarantee Agreement, dated as of June 3, 2015, by and between Prospector Parent and Prospector One Corporation, governed by English law;

4

- that certain Guarantee Agreement, dated as of June 3, 2015, by and between Prospector Parent and Prospector Five Corporation, governed by English law;

- that certain Pledge over Shares Agreement (Prospector Parent), dated as of July 24, 2015, by and between Paragon Parent, as Pledgor, and Prospector One Corporation and Prospector Five Corporation, as Pledgees, and Prospector Parent, governed by Luxembourg law (the "**Prospector Parent Pledge**");

- that certain Pledge over Shares Agreement, dated as of July 24, 2015, by and between Prospector Parent, as Pledgor, Prospector One Corporation, as Pledgee, and Prospector Rig 1 Contracting Company S.à r.l., governed by Luxembourg law; and

- that certain Pledge over Shares Agreement, dated as of July 24, 2015, by and between Prospector Parent, as Pledgor, Prospector Five Corporation, as Pledgee, and Prospector Rig 5 Contracting Company S.à r.l., governed by Luxembourg law.

11.    The Pledge Agreements provide that the Lessee Debtors may not make withdrawals from Earnings Accounts, Rental Reserve Accounts, Capex Reserve Accounts, Opex Reserve Accounts, and Dividend Lock-up Accounts (each as defined herein) without the prior written consent of the Security Agent.  As of the Petition Date, there is approximately $10.63 million in the Earnings Accounts, $32.31 million in the Rental Reserve Accounts, $3 million in the Capex Reserve Accounts, and $3.31 million in the Opex Reserve Accounts.

12.    The Lessee Debtors, Prospector Parent, and certain non-debtor Prospector Debtor subsidiaries also own certain bank accounts that are not subject to the Pledge Agreements or other Security Documents and, as of the Petition Date, hold approximately $17 million in the aggregate.

13.    The Lessee Debtors are obligated to make payments totaling approximately $373 million, in the aggregate, over the course of the Lease Term (including cash rental payments and repurchase obligations).  As of the Petition Date, the principal amount

5

outstanding under the Sale-Leaseback Agreements is approximately $166 million in the aggregate.

14.    The Rigs currently generate monthly revenues totaling approximately $10.5 million in the aggregate, of which approximately $3.4 million is used for monthly rental payments on the Rigs (approx. $1.3 for Prospector 1 and approx. $2.1 for Prospector 5), and, on average approximately $3.5 million is used to pay for operating expenses, leaving, on average, approximately $3.6 million for use by the Prospector Entities.

### The First Filed Debtors' Cases and Negotiations with SinoEnergy

15.    The Sale-Leaseback Agreements provide that the commencement of a proceeding to restructure the indebtedness of Paragon Parent, or Paragon Parent negotiating with creditors concerning a potential restructuring, constituted a Termination Event under the Sale-Leaseback Agreements.  Recognizing that a waiver of such default provisions was necessary to allow Paragon Parent and certain of its affiliates (the "**First Filed Debtors**")[2] to effectively negotiate with their creditors and chapter 11 cases, Paragon Parent negotiated and executed waiver agreements with the Third Party Lessors and the Security Agent on October 14, 2015. Shortly before the expiration of the initial waivers, on February 5, 2016, the Lessee Debtors negotiated and received additional forbearance letters from the Third Party Lessors and the

---

[2] The First Filed Debtors, along with the last four digits of each First Filed Debtor's federal tax identification number, as applicable, are: Paragon Offshore plc (in administration) (6017); Paragon Offshore Finance Company (6632); Paragon International Finance Company (8126); Paragon Offshore Holdings US Inc. (1960); Paragon Offshore Drilling LLC (4541); Paragon FDR Holdings Ltd. (4731); Paragon Duchess Ltd.; Paragon Offshore (Luxembourg) S.à r.l. (5897); PGN Offshore Drilling (Malaysia) Sdn. Bhd. (9238); Paragon Offshore (Labuan) Pte. Ltd. (3505); Paragon Holding SCS 2 Ltd. (4108); Paragon Asset Company Ltd. (2832); Paragon Holding SCS 1 Ltd. (4004); Paragon Offshore Leasing (Luxembourg) S.à r.l. (5936); Paragon Drilling Services 7 LLC (7882); Paragon Offshore Leasing (Switzerland) GmbH (0669); Paragon Offshore do Brasil Ltda.; Paragon Asset (ME) Ltd. (8362); Paragon Asset (UK) Ltd.; Paragon Offshore International Ltd. (6103); Paragon Offshore (North Sea) Ltd.; Paragon (Middle East) Limited (0667); Paragon Holding NCS 2 S.à r.l. (5447); Paragon Leonard Jones LLC (8826); Paragon Offshore (Nederland) B.V.; and Paragon Offshore Contracting GmbH (2832).

Security Agent until March 15, 2016, which allowed for the commencement of the First Filed

Debtors' chapter 11 cases.

16.     On February 14, 2016 (the "**Initial Petition Date**"), the First Filed

Debtors commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.

The commencement of the First Filed Debtors' chapter 11 cases would have triggered further

Termination Events including as a result of cross-default provisions in the Sale-Lease

Agreements had Paragon Parent not obtained the forbearance of the Third Party Lessors and the

Security Agent.

17.     Following the Initial Petition Date, the Lessee Debtors continued to

engage in discussions with the Third Party Lessors and the Security Agent regarding a permanent

waiver of the Termination Event provisions and a continued waiver for the duration of the First

Filed Debtors' chapter 11 cases.  The Lessee Debtors negotiated an additional forbearance

through April 15, 2016, which was subsequently extended through March 7, 2017.  On March 7,

2017, the Lessee Debtors obtained a further extension of the forbearance period through July 31,

2017.

18.     The First Filed Debtors' *Fifth Joint Chapter 11 Plan of Paragon Offshore*

*plc and its Affiliated Debtors* (the "**Plan**"),[3] contemplated a wholesale reorganization of the First

Filed Debtors' balance sheet and corporate structure.  Among other things, the Plan was

premised upon (i) the transfer of certain assets of the Liquidating Subsidiaries (as defined

therein) to certain transferred subsidiaries and/or to the new parent company, New Paragon,

(iii) the transfer of direct and indirect ownership of the Transferred Subsidiaries (as defined

therein) from Paragon Parent to New Paragon, and (iii) the wind down of the Liquidating

---

[3] Capitalized terms used but not otherwise defined herein, shall have the meaning ascribed to such terms in the Plan.

Subsidiaries that remain under the direct or indirect ownership of Paragon Parent[4] pursuant to applicable local law.

19.     The Prospector Entities were among the subsidiaries to be transferred from Paragon Parent to New Paragon.  Because Paragon Parent's shares in Prospector Parent were pledged in favor of the Security Agent under the Prospector Parent Pledge, the First Filed Debtors sought consent to transfer the shares in Prospector Parent (and therefore the Prospector Entities) to New Paragon pursuant to the Plan and a permanent waiver for certain other potential events of default caused by the Plan.

20.     As of the date hereof, the New Debtors have not been able to obtain the consent of, and permanent waiver from, the Third Party Lessors and the Security Agent. Therefore, the First Filed Debtors filed a motion to modify the Plan to the extent necessary to allow the Plan to become effective even though the transfer of the Prospector Entities to New Paragon had not yet occurred (Docket No. 1760).  On July 17, 2017, the Court entered the *Order (I) Authorizing Modification of the Debtors' Fifth Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Pursuant to Section 1127(b) of the Bankruptcy Code and (II) Determining that Further Disclosure and Resolicitation of Votes Are Not Required Pursuant to Section 1127(c) of the Bankruptcy Code* (Docket No. 1775) (the "**Plan Modification Order**"). The Plan Modification Order, which, among other things, modified the Plan to provide that Paragon Parent would not transfer its shares in the Prospector Entities on or before the Effective Date, and, instead, Paragon Parent would agree, pursuant to the Management Agreement (as defined below), to transfer its shares in Prospector Parent (and therefore the Prospector Entities)

---

[4] Pursuant to the Plan and a U.K. Implementation Agreement, a trust containing approximately $11 million in cash was established to fund the costs and liabilities of the administration and winding down of Paragon Parent and liquidating the Liquidating Subsidiaries.  The cash held in the trust does not constitute property of Paragon Parent's estate or any of the other New Debtors' estates.

8

on the earlier of (i) the receipt of consent to the transfer and a waiver of any associated events of default from the Third Party Lessors and the Security Agent, and (ii) discharge of the Lessee Debtors' respective obligations under the Sale-Leaseback Agreements and release of the security over the shares of Prospector Parent.

21.    The Effective Date of the Plan occurred on July 18, 2017.  The New Debtors continued to attempt to reach a consensual agreement with the Third Party Lessors and ICBC to obtain consent to the transfer and a waiver of any associated events of default under the Sale-Leaseback Agreements and/or the Prospector Parent Pledge.  Unfortunately the Third Party Lessors insisted on, among other things, payment of over $30 million in purported termination fees, default interest under the Sale-Leaseback Agreements, and additional fees and expenses. Although the terms of the operative forbearance agreements show that there has been no termination event and that Third Party Lessors are not entitled to default interest, as of the date hereof, the parties have not been able to reach an agreement.  Accordingly, to protect the New Debtors' interest in the Rigs and prevent ICBC and the Third Party Lessors from attempting to exercise self-help remedies in potentially multiple foreign jurisdictions, the New Debtors were forced to commence these chapter 11 cases.  The New Debtors remain open to negotiating in good faith on a sensible and commercial resolution to their disagreements with the Third Party Lessors.

### The Management Agreement

22.    On July 18, 2017, Paragon Parent entered into a management agreement with New Paragon and the Joint Administrators (as amended by an amendment agreement dated on or around 20 July 2017 and as further amended, supplemented and restated from time to time, the "**Management Agreement**").  Pursuant to the Management Agreement, Paragon Parent agreed to:  (i) pay to New Paragon an amount equal to all amounts received by Paragon Parent in

9

respect of the shares in Prospector Parent; and (ii) exercise its rights as holder of the shares of

Prospector Parent as directed by New Paragon (in each case, to the extent permitted by the

Prospector Parent Pledge) and New Paragon agreed to continue to procure the provision of

management services to the Prospector Group (as defined therein) while the Prospector Group

remains held by Paragon Parent.  Further, as described above, pursuant to the Management

Agreement, Paragon Parent undertook to transfer its shares in Prospector Parent (and therefore

the Prospector Entities) to New Paragon on the earlier of:  (i) the receipt of consent to the

transfer and a waiver of any associated events of default from the Third Party Lessors and the

Security Agent, or (ii) discharge of the Lessee Debtors' respective obligations under the Sale-

Leaseback Agreements and release of the security over the shares of Prospector Parent.

## First Day Motions

23.     Below is an overview of the First Day Motions.  The First Day Motions

seek relief intended to facilitate a smooth transition for the New Debtors into these chapter 11

cases and minimize disruptions to the New Debtors' business operations.  Capitalized terms used

but not otherwise defined below shall have the meanings ascribed to them in the First Day

Motions.

## A.      Joint Administration Motion

24.     Pursuant to the joint administration motion (the "**Joint Administration**

**Motion**"), the New Debtors request entry of an order directing consolidation of these chapter 11

cases for procedural purposes only.  I believe that joint administration of these cases will save

the New Debtors and their estates substantial time and expense because it will remove the need

to prepare, replicate, file, and serve duplicative notices, applications, motions, and orders.

Further, I believe that joint administration will relieve the Court of entering duplicative orders

and maintaining duplicative files and dockets.  The United States Trustee for the District of

10

Delaware (the "**U.S. Trustee**") and other parties in interest will similarly benefit from joint administration of these Chapter 11 Cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

25.     I believe that joint administration will not adversely affect creditors' rights because this motion requests only the administrative consolidation of the estates, and does not seek substantive consolidation.  Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of the New Debtors, their estates and all parties in interest, and should be granted in all respects.

B.     **Cash Management System Motion**

26.     Pursuant to the cash management system motion (the "**Cash Management Motion**"), the New Debtors request (a) interim and final authority to (i) continue their existing cash management system, (ii) continue using their existing business forms and bank accounts, and (iii) continue their intercompany arrangements; (b) waiver of the requirements of section 345(b) of the Bankruptcy Code; and (c) related relief.  The New Debtors also request that the Court authorize Banks to continue to charge Bank Fees and to charge back returned items to the Bank Accounts, whether such items are dated before, on, or after the Petition Date.

27.     The Lessee Debtors generate revenues primarily through the operation of the Rigs pursuant to drilling contracts.  In the ordinary course of their businesses, the New Debtors employ a cash management system (the "**Cash Management System**")[5] to collect, transfer, and disburse funds generated by the operation of these rigs.  The Cash Management

---

[5] Paragon Parent has no operative cash management system or cash that constitutes property of Paragon Parent's estate.  As discussed above, pursuant to the chapter 11 plan, a trust containing approximately $11 million in cash was established to fund the costs and liabilities of the administration and winding down of Paragon Parent. Accordingly, the relief requested in the Cash Management Motion relates to the Prospector New Debtors.

System has several main components:  (i) cash collection, including the collection of payments made to the New Debtors from revenue generated in the ordinary course of business, (ii) cash transfers across the New Debtors' accounts, and (iii) cash disbursements to fund the New Debtors' business operations.  The Cash Management System allows the New Debtors to ensure cash availability and liquidity, maintain sufficient reserves for their expenses, and efficiently utilize the cash generated by their business to satisfy their financial obligations (namely, their payroll, payments to vendors, and lease payments for the Rigs).  In addition to these benefits, the Cash Management System also gives the New Debtors the ability to easily track and allocate their funds.

28.     The New Debtors' Cash Management System is a centralized system composed of a total of 30 bank accounts (the "**Bank Accounts**") held at various financial institutions (the "**Banks**"), including HSBC, Bank of America ("**BOA**"), ABN Amro, ICBC, and ING Bank ("**ING**").  Annexed as **Exhibit C** to the Cash Management Motion is a chart illustrating the Cash Management System.

29.     The New Debtors maintain separate, but similarly structured, sets of Bank Accounts corresponding to the Rigs to collect and disburse their respective revenues.  The flow of funds through the New Debtors' accounts is governed by the Sale-Leaseback Agreements.

30.     Revenues from the Prospector 1 Rig are generally deposited into one of two earnings accounts depending on their denomination.  All revenues in British pounds sterling are deposited into a British pound-denominated Bank Account with ICBC ending in -1012 (the "**Prospector 1 Sterling Earnings Account**"), and all earnings in U.S. dollars are deposited into a U.S. dollar-denominated Bank Account with ICBC ending in -1018 (the "**Prospector 1 Dollar Earnings Account**" and, together with the Prospector 1 Sterling Earnings Account, the

12

"**Prospector 1 Earnings Accounts**").  Similarly, revenues from the Prospector 5 Rig are generally deposited into one of two earnings accounts depending on their denomination.  All revenues in British pounds sterling are deposited into a British pound-denominated Bank Account with ICBC ending in -1019 (the "**Prospector 5 Sterling Earnings Account**"), and all earnings in U.S. dollars are deposited into a U.S. dollar-denominated Bank Account with ICBC ending in -1015 (the "**Prospector 5 Dollar Earnings Account**" and, together with the Prospector 1 Sterling Earnings Account, the "**Prospector 5 Earnings Accounts**").

31.     Funds in the Prospector 1 Earnings Accounts and the Prospector 5 Earnings Accounts (collectively, the "**Earnings Accounts**") are used to pay operating expenses up to a cap of $85,000 per day for each rig (the "**Operating Expenses Cap**").  With respect to the Prospector 1, an amount equal to the Operating Expenses Cap (or a lower amount reflecting actual operating expenses) is transferred each month from the Prospector 1 Earnings Accounts to a Bank Account with BOA ending in -3014.  Similarly, an amount equal to the Operating Expenses Cap for the Prospector 5 (or a lower amount reflecting actual operating expenses) is transferred on a monthly basis from the Prospector 5 Earnings Account to a Bank Account with BOA ending in -3030.  As explained further below, these amounts are ultimately used to pay the New Debtors' vendors, payroll, and taxes.

32.     In addition to the Earnings Accounts, the Sale-Leaseback Agreements require the establishment of certain reserve accounts for the respective Rigs.  Pursuant to the Prospector 1 Sale-Leaseback Agreement, Prospector Rig 1 Contracting Company S.à r.l. maintains an operating expenses reserve account with ICBC ending in -1067 (the "**Prospector 1 Opex Reserve Account**"), a rental reserve account with ICBC ending in -1026 (the "**Prospector 1 Rental Reserve Account**"), and a capital expenditure reserve account with ICBC ending

13

in -1034 (the "**Prospector 1 Capex Reserve Account**").  Similarly, pursuant to the Prospector 5

Sale-Leaseback Agreement, Prospector Rig 5 Contracting Company S.à r.l. maintains an

operating expenses reserve account with ICBC ending in -1064 (the "**Prospector 5 Opex**

**Reserve Account**," and together with the Prospector 1 Opex Reserve Account, the "**Opex**

**Reserve Accounts**"), a rental reserve account with ICBC ending in -1023 (the "**Prospector 5**

**Rental Reserve Account**," and together with the Prospector 1 Rental Reserve Account, the

"**Rental Reserve Accounts**"), and a capital expenditure reserve account with ICBC ending

in -1031 (the "**Prospector 5 Capex Reserve Account**" and, together with the Prospector 1

Capex Reserve Account, the "**Capex Reserve Accounts**").

        33.     After operating expenses are paid and any surplus is distributed to the

applicable Opex Reserve Account, each of the Lessee Debtors must transfer an amount equal to

the monthly rent payment for each Rig pursuant to its corresponding Sale-Leaseback Agreement

to an account maintained by the applicable Third Party Lessor.  As previously discussed, the

Prospector 1 and the Prospector 5 currently generate combined revenue of approximately $10.5

million.  The New Debtors pay approximately $3.4 million per month in aggregate rental

payments and approximately $3.5 million in operating expenses in the aggregate.

        34.     After payment of monthly rent and operating expenses, remaining funds in

each Earnings Accounts are first deposited into the corresponding Opex Reserve Account, the

Capex Reserve Account, and the Rental Reserve Account, (in each case, if necessary to maintain

the minimum required balances in those accounts pursuant to the Sale-Leaseback Agreements).

If there is any remaining surplus after these distributions, 100% of that amount is transferred to

the applicable Rental Reserve Account and used to pay down the outstanding obligations under

the Sale-Leaseback Agreements on a quarterly basis.  After the expiration of the initial drilling

RLF1 17854168V.1

contract for each of the Rigs, certain amounts may be transferred into either a restricted account (for each Lessee Debtor, the "**Dividend Lock-up Account**") or a distribution account (for each Lessee Debtor, the "**Distribution Account**").

35.     Such excess funds must be placed in the Dividend Lock-up Accounts if certain restriction events (the "**Dividend Restriction Events**") set forth in the Sale-Leaseback Agreements have occurred and are continuing, such as the occurrence of a termination event under the Sale-Leaseback Agreement or a failure to fund certain of the reserve accounts.  If no Dividend Restriction Event is occurring, excess funds are deposited into the Distribution Accounts, where such funds can be freely accessed and withdrawn by the New Debtors.  To date, the Dividend Lock-up Accounts and Distribution Accounts have not received deposits because the initial drilling contracts have not yet expired or there has not been any distributable cash.

36.     In connection with their obligations under the Sale-Leaseback Agreements and related documents, the Lessee Debtors granted security interests in certain of their accounts to ICBC, as Security Agent under the Sale-Leaseback Agreements.  The Lessee Debtors granted these interests pursuant to the Pledge Agreements, as applicable.

37.     Pursuant to the Pledge Agreements, the Lessee Debtors may not make withdrawals from any of the Earnings Accounts, Rental Reserve Accounts, Capex Reserve Accounts, Opex Reserve Accounts, and/or Dividend Lock-up Accounts without the prior written consent of the Security Agent.  As previously noted above, as of the Petition Date, there is approximately $10.63 million in the Earnings Accounts, $32.31 million in the Rental Reserve Accounts, $3 million in the Capex Reserve Accounts, and $3.31 million in the Opex Reserve Accounts.  The Lessee Debtors, Prospector Parent, and certain non-debtor subsidiaries of Prospector Parent also own certain bank accounts that are not subject to the Pledge Agreements

15

or other Security Documents and, as of the Petition Date, hold approximately $17 million in the aggregate.

38.    In the ordinary course of business, the New Debtors rely on the services of two nondebtor affiliates:  Prospector Offshore Drilling (UK) Ltd. ("**POD UK**") and Prospector Offshore Drilling (Singapore) Pte. Ltd. ("**POD Singapore**," and together with POD UK, the "**Nondebtor Service Entities**").  These entities are central to the operations of the New Debtors, as nearly all of the New Debtors' 128 employees are employed by POD Singapore, and all of the New Debtors' trade vendors are paid by POD UK.  On a monthly basis, funds for the Lessee Debtors' employee payroll are transferred to an ING account ending in -47803010 held by Prospector Finance S.à r.l., Lux.  Similarly, funds for the Lessee Debtors' taxes and vendor payables are transferred to a BOA account ending in -1494 held by POD UK.  Based on this structure, the Nondebtor Service Entities necessarily must be funded by the New Debtors to maintain the current Cash Management System.

39.    If approved by the Court, the interim proposed order provides that the New Debtors will not (i) make any payment in excess of the statutory caps set forth in section 507(a)(4) and (5); (ii) make any payments that violate section 503(c) of the Bankruptcy Code; or (iii) pay unused vacation, except as otherwise provided under applicable law.

40.    The New Debtors maintain records of all intercompany transactions and can ascertain, trace, and account for these transactions.  I believe that discontinuation of intercompany transactions among the above-referenced entities would hinder the provision of critical employees, services, and goods to the New Debtors.

41.    In the ordinary course of business, the New Debtors incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts certain service charges and other

16

fees, costs, and expenses charged by the Banks (collectively, the "**Bank Fees**").  As a result of the New Debtors' extensive need to use Bank Accounts in the ordinary course of business, the Bank Fees currently average approximately $2,500 per month to the New Debtors' Banks.  To the extent the balance in a Bank Account decreases below a threshold amount established by the applicable Bank, the New Debtors may incur fees for sending and receiving wire transfers, clearing checks, automated clearinghouse transfers, and other transactions.

42.    I believe that the New Debtors' business could not function if the Cash Management System were disrupted.  The Cash Management System constitutes an ordinary-course and essential business practice providing significant benefits to the New Debtors, including, among other things, the ability to control corporate funds, ensure the maximum availability of funds when and where necessary, and reduce borrowing costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.  Any disruption of the Cash Management System could have a severe and adverse impact upon the New Debtors' value.

43.    I am informed that the New Debtors will maintain all records of receipts, disbursements, and transfers within the Cash Management System, including postpetition intercompany transactions and any intercompany balances that existed as of the commencement of these chapter 11 cases.  I am also informed that all transfers and transactions will be properly documented, and accurate intercompany balances will be maintained.

44.    The New Debtors request that all Banks at which the Bank Accounts are maintained be authorized and directed to continue to administer such accounts as they were maintained prepetition, without interruption, and in the ordinary course of business.

RLF1 17854168V.1

45.     The Banks in which Disbursement Accounts exist also should be authorized and directed to pay any and all drafts, wires, and ACH transfers issued on the Bank Accounts for payment of any claims arising on or after the Petition Date, or prior to the Petition Date to the extent such claims were approved by order of the Court, in each case so long as sufficient funds are in these accounts.

46.     In these chapter 11 cases, strict enforcement of the U.S. Trustee's Operating Guidelines, as I understand them, with respect to the Cash Management System would severely disrupt the New Debtors' ordinary financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses.  For example, if the New Debtors were required to open new debtor-in-possession accounts and modify the Cash Management System accordingly, the New Debtors would be forced to reconstruct the Cash Management System in its entirety.  Many accounts could not be replaced in time to effectively continue the New Debtors' business; even if they could, the opening of new bank accounts would increase operating costs, and the delays that would result from opening new accounts, revising cash management procedures, and instructing customers to redirect payments would negatively impact the New Debtors' ability to operate their business while establishing these new arrangements.

47.     The New Debtors should also be permitted to maintain their business forms.  The New Debtors issue manual checks from time to time and use a variety of business forms in the ordinary course of their business.  Changing this practice would increase the New Debtors' expenses and would risk unnecessarily confusing the New Debtors' customers, suppliers, and employees.  Accordingly, the New Debtors believe it is appropriate to continue to use all correspondence and other business forms (including letterhead, purchase orders, invoices,

18

and all other business forms) as such forms were in existence prior to the commencement of these chapter 11 cases.  Further, in light of the expense and delay attendant in ordering entirely new business forms, the New Debtors believe it is appropriate to use their existing correspondence and other business forms without any reference to the New Debtors' current status as debtors in possession.

48.     The New Debtors also request a waiver of the requirements of section 345(b) of the Bankruptcy Code.  Here, the New Debtors' Banks are highly rated, nationally chartered banks subject to supervision by national banking regulators; the New Debtors retain the right to close accounts with the Banks and establish new bank accounts as needed; the cost associated with satisfying the requirements of section 345(b) is needlessly burdensome to the New Debtors and their estates; and the process of satisfying such requirements would lead to needless inefficiencies in the management of the New Debtors' business.  Furthermore, the unique international nature of the New Debtors' business requires Bank Accounts in multiple jurisdictions.  The benefits of an interim waiver would far outweigh any potential harm to the estates from noncompliance with section 345(b).  Moreover, a bond secured by the undertaking of a corporate surety would be prohibitively expensive (if such a bond could be obtained at all). Accordingly, the Court should waive the requirements of section 345(b) in these chapter 11 cases.

49.     Based on the foregoing, I believe that the relief requested in the Cash Management Motion is in the best interests of the New Debtors, their estates, and all parties in interests and should be approved.

**C.    Cash Collateral Motion**

50.     Pursuant to the cash collateral motion (the "**Cash Collateral Motion**"), the New Debtors request entry of an interim order (i) authorizing the use of Cash Collateral and

(ii) providing adequate protection to the Security Agent for any diminution in value of its interests in the Prepetition Collateral (defined below).  The New Debtors also request a final hearing to consider the relief requested in the Cash Collateral Motion.

51.    To secure obligations arising under the Sale-Leaseback Agreements, the Lessee Debtors granted the Prepetition Liens in the prepetition collateral described in the Security Documents (collectively, the "**Prepetition Collateral**," which includes Cash Collateral) to the Security Agent.

52.    The Pledge Agreements provide that the Lessee Debtors may not make withdrawals from Earnings Accounts, Rental Reserve Accounts, Capex Reserve Accounts, Opex Reserve Accounts, and Dividend Lock-up Accounts without the prior written consent of the Security Agent.

53.    The Lessee Debtors are obligated to make payments totaling approximately $373 million, in the aggregate, over the course of the Lease Term (including cash rental payments and repurchase obligations).  As of the Petition Date, the principal amount outstanding under the Sale-Leaseback Agreements is approximately $166 million in the aggregate (together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Sale-Leaseback Agreements, the "**Prepetition Obligations**").

54.    The Rigs currently generate monthly revenues totaling approximately $10.5 million in the aggregate, of which approximately $3.4 million is used for monthly rental payments on the Rigs (approximately $1.3 for Prospector 1 and approximately $2.1 for Prospector 5), and, on average approximately $3.5 million is used to pay for operating expenses, leaving, on average, approximately $3.6 million for use by the Prospector entities.

55.     These proceedings were commenced, in large part, because the Third Party Lessors and ICBC demanded, among other things, immediate payment of over $30 million in purported termination fees and default interest under the Sale-Leaseback Agreements.  The New Debtors now request interim authority to use Cash Collateral in accordance with the terms of the Proposed Interim Order and the Proposed Final Order.

56.     The New Debtors have not had access to their Cash Collateral since the Petition Date and need funds primarily to make monthly lease payments due under the Sale-Leaseback Agreements, pay operating expenses relating to the ordinary course operations of the Rigs, and pay employees and other expenditures that are critical to their continued viability and ability to reorganize their capital structure.

57.     I believe that the preservation of the New Debtors' business and the New Debtors' ability to reorganize successfully depend heavily upon the expeditious approval of the use of Cash Collateral for general working capital purposes.  Absent this Court's approval of the interim relief sought herein, the New Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with their vendors and customers.

58.     The New Debtors' request for use of Cash Collateral is for rental payments and expenses reasonably calculated to maximize the value of the New Debtors' assets. I believe that that the terms and conditions of the New Debtors' use of the Cash Collateral (including the provision of adequate protection described herein) are appropriate and reasonable, and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances.

59.      To protect the Security Agent to the extent of any aggregate diminution in value of the Prepetition Collateral resulting from the use of Cash Collateral, the New Debtors propose to provide adequate protection consisting of (a) replacement liens on all property and assets of the New Debtors, and all proceeds, rents, or profits thereof, that were subject to the Prepetition Liens (the "**Adequate Protection Liens**") and (b) and superpriority claims under section 507(b) of the Bankruptcy Code (the "**Superpriority Claim**").

60.      I believe that proposed adequate protection provides the Security Agent with sufficient adequate protection to protect any diminution in value of the Security Agent's interests in the Prepetition Collateral during the chapter 11 cases.  I believe that the relief requested in the Cash Collateral Motion is in the best interests of the New Debtors, their estates, and all parties in interests and should be approved.

**D.**      **Utilities Motion**

61.      Pursuant to the utilities motion (the "**Utilities Motion**"), the New Debtors request entry of interim and final orders (i) approving the New Debtors' proposed form of adequate assurance of payment for postpetition Utility Services (as hereinafter defined); (ii) establishing procedures for resolving objections by Utility Companies (as hereinafter defined) relating to the adequacy of the proposed adequate assurance; and (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the New Debtors on the basis of the commencement of these chapter 11 cases or that a debt owed by the New Debtors for Utility Services rendered before the Petition Date (as hereinafter defined) was not paid when due.

62.      To operate their business and manage their properties, the New Debtors obtain telecommunications, satellite, waste disposal, water, gas, electricity, and other utility services (collectively, the "**Utility Services**") from a number of utility companies (collectively,

22

the "**Utility Companies**").  A nonexclusive list of Utility Companies that provide Utility

Services to the New Debtors as of the Petition Date is provided on **<u>Exhibit 1</u>** annexed to the

Proposed Interim Order and the Proposed Final Order (the "**Utility Services List**").

63.     To the best of my knowledge, there are no defaults or arrearages of any

significance for the New Debtors' undisputed invoices for prepetition Utility Services, other than

payment interruptions that may be caused by the commencement of these chapter 11 cases.

Based on their monthly average for the twelve (12) months prior to the Petition Date, the New

Debtors estimate that their cost of Utility Services for the next thirty (30) days will be

approximately $45,000.

64.     I believe that uninterrupted Utility Services are essential to the New

Debtors' ongoing operations and, therefore, the success of the New Debtors' reorganization.  I

understand that should any Utility Company alter, refuse, or discontinue service, even briefly,

the New Debtors' business operations could be severely disrupted, which would hinder the New

Debtors' efforts to successfully reorganize.

65.     The New Debtors intend to timely pay all postpetition obligations owed to

the Utility Companies and I believe that the New Debtors have sufficient funds to do so.

Nevertheless, to provide adequate assurance to the Utility Companies, the New Debtors propose

to deposit cash in an amount equal to two (2) weeks' payment for Utility Services, calculated

using the historical average for such payments during the past twelve (12) months (an

"**Adequate Assurance Deposit**") into a newly created segregated account for the benefit of the

Utility Companies (a "**Utility Deposit Account**").

66.     The Adequate Assurance Deposit will be placed into the Utility Deposit

Account within twenty (20) days after the Petition Date.  The New Debtors estimate that the total

23

amount of the Adequate Assurance Deposit will be approximately $22,500.  The Adequate

Assurance Deposit will be held by the New Debtors in the Utility Deposit Account for the

benefit of the Utility Companies on the Utility Services List during the pendency of these chapter

11 cases; and a Utility Company will be eligible to receive payment from the Adequate

Assurance Deposit in an amount equal to two (2) weeks of its Utility Services.

      67.     I believe that the relief requested will ensure the continuation of the New

Debtors' business at this critical juncture as the New Debtors transition into chapter 11.  I believe

that the relief requested also provides the Utility Companies with a fair and orderly procedure for

determining requests for additional adequate assurance.

      68.     Based on the foregoing, I believe that the relief requested in the Utilities

Motion is in the best interests of the New Debtors, their estates, and all parties in interests and

should be approved.

**E.**       **Automatic Stay Enforcement Motion**

      69.     Pursuant to the automatic stay enforcement motion, the New Debtors

request entry of an order enforcing the protections of sections 362, 365, 525, and 541(c) of the

Bankruptcy Code to aid in the administration of these chapter 11 cases and to help ensure that

the New Debtors' global business operations are not disrupted.  As previously noted, the New

Debtors' business is truly global and involves extensive dealings with foreign creditors and

governmental authorities, many of which are unfamiliar with the protections of the automatic

stay imposed by section 362 of the Bankruptcy Code, the invalidation of ipso facto clauses under

section 365(e)(1) of the Bankruptcy Code, the ipso facto conditions under section 541(c) of the

Bankruptcy Code, and the protections against discriminatory treatment contained in section 525

of the Bankruptcy Code.

70.     I have been informed that the protections afforded by sections 362, 365, 525, and 541(c) of the Bankruptcy Code are self-executing and global; however, I believe that not all parties affected or potentially affected by the commencement of a chapter 11 case are aware of these statutory provisions or their significance and impact.  Consequently, I believe that it is prudent to obtain an order of the Court that confirms and reinforces the relevant provisions of each section so the New Debtors may advise such parties of the existence and effect of sections 362, 365, 525, and 541(c) of the Bankruptcy Code.

71.     I believe that the requested relief is particularly appropriate in the present cases because the New Debtors, through their non-debtor affiliates, conduct significant operations in foreign countries and, as a result, incur obligations to foreign customers, employees, independent contractors, vendors, service providers, utility companies, taxing authorities, and other entities.  In addition, many of the New Debtors' foreign creditors and contract counterparties may be unfamiliar with the scope of a debtor in possession's authority to conduct its business.  Specifically, these parties may be unaware of, or inclined to disregard, the protections of the automatic stay and other provisions of the Bankruptcy Code that assist the New Debtors, as debtors in possession, during their chapter 11 cases and restructuring efforts.

**F.      Claims Agent Retention Application**

72.     Pursuant to section 156(c) of title 28 of the United States Code, section 105(a) of the Bankruptcy Code, and Local Rule 5075-1, the New Debtors request authority to appoint Kurtzman Carson Consultants, LLC ("**KCC**") as claims and noticing agent in the New Debtors' Chapter 11 Cases, in accordance with the terms and conditions of that certain engagement agreement dated as of July 20, 2017, effective *nunc pro tunc* to the Petition Date.

73.     The New Debtors request entry of an order appointing KCC as the Claims and Noticing Agent for the New Debtors and their Chapter 11 Cases, including assuming full

25

responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the New Debtors' Chapter 11 Cases.  In view of the number of anticipated claimants and the complexity of the New Debtors' businesses, I believe that the appointment of KCC as claims and noticing agent is in the best interests of both the New Debtors' estates and their creditors.

74.     Based on the foregoing, I believe that the relief requested in this motion is in the best interests of the New Debtors, their estates, and all parties in interests and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 20, 2017
         Houston, Texas

*/s/ Lee M. Ahlstrom*                                  
Lee M. Ahlstrom
Authorized Representative

RLF1 17854168V.1

**EXHIBIT A**

**Corporate Organizational Chart**

## Prospector Group

